FILED 08 FEB 25 16:40 USDC-LAE



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATTY TROXCLAIR                                  CIVIL ACTION NO.

v

PATRICK F TAYLOR FOUNDATION                      **08-1128**
and
TAYLOR ENERGY COMPANY LLC                        JUDGE:
                                                 MAGISTRATE JUDGE: **SECT. I MAG. 3**

## COMPLAINT

### Jurisdiction and venue

1. This action is brought under Title VII. Jurisdiction is based on 28 USC sec. 1343. A Right-to-sue letter, dated February 1, 2008 was obtained. Venue in this district is proper because all conduct complained of occurred in this district.

### Parties

2. Plaintiff is Patty Troxclair. From February 11, 2004 until May 10, 2004 plaintiff was a temporary employee and thereafter until June 29, 2006 she was employed full time by the Patrick F Taylor Foundation (Foundation) which had four employees, including plaintiff and by the Company.

3. Defendants are Patrick F Taylor Foundation (Foundation) and Taylor Energy Company LLC (Company). They are alleged to be the multiple employers of plaintiff. Patrick F Taylor was, until his death, the Chairman and CEO of the Company. His wife, Ms Phyllis Taylor, was, at all relevant times, the Chairman and President of the Foundation.

4. The Foundation was located in the same building in New Orleans as Taylor Energy Company LLC (Company) and plaintiff was paid by checks from the Company. The Executive Director of the Foundation was Dr James A Caillier, who also served as the Vice-President of External Affairs for the Company.

5. When she was applying for employment with the Foundation, Dr Callier told her that he was waiting for Mr Taylor's approval and then, once that approval came through, told her that she should meet with Glenda Bellanca, in the Company's HR department. Ms Bellanca was Vice-President of Administration for the Company. She was not affiliated with the Foundation.

6. When plaintiff was hired (or shortly thereafter) a 401(k) plan with the Company was set up for her; all insurance was set up through the Company; she was issued a

___ Fee __350.___
_✓_ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No_____

name tag with Taylor Energy on it for Company functions; issued Company memo pads with her name on it; and all her payroll checks were Company checks.

7. She was told at least once by Grace Wright, secretary to Dr Caillier in both his capacities, not to mention that she worked for the Foundation because the Foundation was not supposed to have any paid employees. All Foundation employees were paid by Company checks.

8. Most memoranda which she received were from the Company; few, if any, were from the Foundation; she performed tasks for the Company such as back-up receptionist for the Company; creating and updating an employee directory; reworking and updating various Company logos for use in different formats; conceptualized and designed various Company ads, invitations, flyers; created and designed expense reports; and retouched and altered photographs and images.

9. There were two other similar "employees" of the Foundation. Ms Wright also worked for both the Foundation and the Company. Elena Penn, the Foundation media coordinator, took photographs for the Company directory.

10. Plaintiff was directed to take any employment related problems to the Company HR department (Glenda Bellanca) and did so at least six times. Later, Ms Bellanca announced Ms Troxclair's 30-day probation to her on February 7, 2006.

11. When she was terminated, the Company played the deciding role.

12. During her last week of work, Dr Callier called her into his office, advised that the other two ladies in the Foundation could not work with her, and that the Company HR people would talk to her two days later, June 29.

13. However, two days early, on June 27, the HR head, Skip Hebert, arrived. They discussed the work situation in Dr Caillier's department. Plaintiff stated that she loved her work and her belief that she did a good job and asked whether there were some other place in the company where she could work. Herbert suggested a graphics designer position under Glenda in administration; she agreed. She stated that she could work with the two other women, but that Dr Caillier had turned them against her.

14. Within 1-2 days, Dr Caillier stated to plaintiff that she had talked badly about Elena in her conference with Hebert, that this was bad for her, and she should not have done it. He stated that it was Hebert (Company HR) and Ms Taylor's decision that she be terminated.

15. Hebert (Company HR) then came and told her that John Pope (Company President) and Dr Caillier had spoken the night before and decided to terminate her.

16. The Company is a major source of funds for the Foundation.

17. The Foundation is an essential part of the Company's mission.

### Count 1- Sexual harassment, New Orleans, before Katrina

18. Plaintiff reported to Dr Caillier for the entire time she was at Taylor. Beginning before her full time employment, Dr Caillier began to mention to her that the job was a 24-hour job and that she had to be available at all hours. She would have to stay after hours in order to complete her work if he were detained in a meeting.

19. He asked on several occasions why she was not married and suggested that she needed a boyfriend.

20. On one occasion after hours he advised that they could not talk at the office and that they "should go somewhere else." She was to drive him to his Company apartment across from the Pontchartrain Hotel. There he asked about her background and she told him of her difficulties in landing long-term work. They were sitting on a sofa. He tried to kiss her. She pushed him away and stated that she wanted to leave which they did. He advised her that she could not disclose that she had been to his apartment.

21. He later once remarked that every time he saw her he wanted to hug and kiss her. He hugged once her in such a way that she could feel he had an erection. Both these instances made her very uncomfortable. She pushed him away and walked out. She cannot remember if this occurred before or after she became full time.

22. After she was hired full time, he told her there was an unwritten rule that she had to buy him dinner; all newly hired employees had to buy their supervisors dinner. She never complied.

23. Probably after she started full time, she, Elena, and Grace went to dinner with Dr Caillier in the French Quarter at an Italian Restaurant. He sat next to her and put his hand on her right leg. She moved her leg away and never sat next to him again.

24. He would also pat her on the back, rub her shoulders, and ask how she was doing. This occurred 6-12 times, probably all before the Company temporarily re-located

to Lafayette because of Hurricane Katrina (see below), and most usually after he had been harsh toward her.

25. He commented twice that she had long fingers and long hands for a woman. He asked if she knew what that meant, and when she stated she did not, he explained that a woman with those attributes would make a good lover.

26. On 5-6 occasions he suggested that she unbutton the top button of her blouse. She refused each time.

27. He asked several times what she did when she got home. When she replied that she had dinner with her parents. He responded that they were old and she should not worry about them.

28. During a period of a few weeks before a sexual harassment video (see below), a former employee, Margaret Gleeman, was asking questions of female employees about intimate questions that Dr Caillier was asking her.

29. About November 2004, the company showed a sexual harassment video that was presented by an attorney. At the end of the video, all employees were instructed to discuss their concerns with either Frank Barber or Glenda Bellanca.

30. Plaintiff did not follow up because she was afraid of losing her job. Paul Dupont (Safety Manager) told her that after making three years she would be fairly secure, but to watch her back until then. There was no confidentiality within the Foundation or Company as to personnel matters - she heard these matters discussed and co-employees warned her that people gossiped.

### Count 2- Retaliatory harassment, New Orleans, before Katrina

31. After the video, Dr Caillier's overtly sexual harassment ceased, but he began to have an ugly look on his face when he would speak to or look at plaintiff. He began an immediate campaign of hostility consisting of on going criticism of her personality, relations with others, her job skills, driving, and threats to fire her for those reasons. For the most part he would call her to his office when he made remarks such as:

> I'm the only one who can protect you here. I'm the one who got you hired. The people here did not want to hire you. Joe Lucas did not want to hire you.

He made the general remark about ten times and the Lucas remark about twice.

(Later in Lafayette she asked Lucas about his purported remark and he denied it. He said he recommended her for the position.)

32. Further, generally, on two of these occasions he told her, "They told me I should have hired a man for your position. You can't have three women working in an office because they will not get along with each other. The two who have been there the longest will be jealous of the one that just got hired. This happens all the time. We tried a third woman before and it didn't work."

33. He also remarked, "You have good job skills, but there are people out there with better skills." He made this remark about 4-5 times.

34. One time he told her. "If you don't watch it, you'll be selling retail again." Dr Caillier knew that she had done this before and how much she disliked it.

35. He also criticized her driving 5-6 times, but named the source only once.

36. He also made negative remarks about her relations with other employees in Taylor Energy. He would tell her that someone (usually unnamed, but sometimes Melissa, the receptionist; Patricia Logsdon, secretary to Taylor's president, John Pope; or one or two of the other women in the office) had reported something negative about her. When she would try to defend herself, he told her to "shut up" or "shut your mouth."

37. On one occasion she was walking with Dr Callier, and possibly Grace and Elena, when he hit her in the middle of the back as she started to say something. This may have been in connection with a birthday function. She does not remember the date.

38. These remarks about negative relations with other employees were made at least three times as often as all the other remarks combined.

39. He would tell her that she did "not have an opinion; don't open your mouth." This occurred about 5 times, normally in a meeting with the other women and mostly in New Orleans, before Katrina.

40. As often as several times a week, throughout her employment he would call her privately into his office and make the above negative remarks such that she would be crying at least every other week. This began after the sexual harassment video and went on through the Lafayette period until about January 3, 2006 when the company returned to New Orleans.

Case 2:08-cv-01128-LMA-DEK   Document 1   Filed 02/25/08   Page 6 of 13

41. Witnesses to these crying episodes in New Orleans were Melissa Calegan, Sgt Major Joe Forbes, Jerry Lucas (security), and Glenda. In Lafayette, the witnesses were Joe Lucas (treasurer), Glenda, and less often, Mr Forbes. Other witnesses were Sue Curry, Larry Scott, Kate Lankamer, Claudette Williams, and Margaret Gleeman.

41A. She also had nightmares a couple times per week; she lost sleep, appetite, and memory; she had bad headaches and stomach aches. Most of these symptoms had begun in New Orleans before the Company moved to Lafayette because of Hurricane Katrina.

42. Specifically, probably in January 2005, he told her after the December board meeting that they had to "work cohesively as a team; they were looking at his job closely; and some people think they can do a better job." "We should not discuss anything with anyone else."

43. On February 14, 2005 he criticized her for sitting next to Glenda Bellanca, the vice-president of administration and in charge human resources, at a baby shower. Plaintiff had been seated next to Mrs Bellanca by Mrs Bellanca herself who had made the seating arrangements.

43. In the last week of April 2005 he criticized her for sitting next to Mrs Taylor at the funeral for Sue Curry's husband.

44. Probably after the June board meeting, Dr Caillier told her that Ms Taylor had approved her memorial book design and also wanted an insert of a collage of photographs of M/M Taylor with friends.

45. On July 11, 2005 he warned her of three items. First, that John Pope, President, "wanted to fire her" because of a complaint by Patricia Logsdon about her driving in or near the company parking lot. "This is a serious complaint and you might want to consider finding another job." He went on to complain secondly, that "she got to work early and went home at 5:00 pm" and he "did not know why she went right home." Finally, he complained, "You don't have anything to do anyway. I don't know why you worry about your parents, they're old." He concluded by saying she should "remember this date, this is a warning."

46. The other two women ordinarily did not stay past 5 o'clock, except for Elena who would stay 5-10 minutes if she had been late.

**Count 3 - Continued retaliatory harassment post-Katrina in Lafayette**

47.  As a result of Katrina, the Company moved to Lafayette (for about four months) and was housed there at Company expense. She arrived there on September 9, 2005.

47A. Generally, throughout the Lafayette period Dr Caillier continued to have an ugly expression on his face. If he saw plaintiff going in the direction of Glenda's office (the HR person), in addition to having an ugly look on his face, he would angrily question her when she returned about why she had gone there. This occurred off and on several times a week depending on whether Glenda or Dr Callier were there. Once or twice he asked her where she had been when she had only been to the bathroom which was in the direction of the office of Frank Barber, VP of Land and Legal.

48.  One day in Lafayette he instructed her not to talk to Ms Taylor about anything. (Ms Taylor had brought her photos to scan for the memorial publication in honor of Mr Taylor.)

49.  More particularly, plaintiff had called Dr Callier on September 6, 2005 from a relative's home in Vacherie. He advised her she should "commute from Vacherie because everyone's here already." "If she did not follow directions she would not have a job." However, when she got to Lafayette on September 9, he told her that the other two employees would be in on September 12.

50.  On September 21, 2005 he made his first public criticism of her in front of the other employees. Part of the remark was similar to the one above about going straight home from work: "One of you will be sent home and there's nothing you can do about it. Patty, it's you. You seem to have a problem with me, Grace, and Elena; if you don't change, then you will not have a job with Taylor Energy; you're not like the rest of us; you're different; you're abnormal; this is not your family, this is a business; I followed you home the other day and you were weaving in and out of traffic. I can't help you with a ticket in Lafayette. You rush out of here and go right home, but you don't have anything to do at home.

"You have some skills, but there are more people out there with better skills than you. You will not have a job when we get back to New Orleans. You'll see. We'll see where you'll be working."

Callier said much more, but she was reduced to tears and, on the suggestion of one of the other women, saw Carol Miers, a counselor supplied by the company, for the first time on this same day. She saw Bill Folsom and Melissa on the way to Ms Miers' room in the same building.

His remark that he had followed her home both confused and frightened her because he lived in a different part of Lafayette.

Altogether in New Orleans, Lafayette, and again in New Orleans, Dr Callier made some variation of remark about going home immediately after work 6-8 times.

51. On October 3, 2005, plaintiff met with, Dr Caillier, Elena, and two people from the Russo group, i.e., Jackie Russo, to discuss the memorial book. Dr Caillier asked if everything were ready to send to the printers. He asked when she would be finished. She replied that she was still waiting for comments from a couple of board members and for a caricature that was to have been fedex'd. He got angry and announced that they would have someone else do the entire book.

52. Within a week he told her to quit work on her version and that the Russo group had redone the book with the board members' contributions and the caricature which plaintiff had included in her nearly completed version. She showed him her version and he said, "Ms Taylor had already made her decision" and told her "don't dare show" her version to anyone.

53. About this same time, he told her in his office that one or the other of them would not have a job and it would not be him.

54. On October 21, 2005, with Glenda (at her request) on a quick lunch time shopping trip to Dillard's, plaintiff complained about Dr Caillier. Glenda suggested that she start taking notes and put the complaint in writing to her. Plaintiff mentioned the sexual harassment training film and learning that she and Frank Barber were the people to go to and that she could not go to Mr Barber. Glenda agreed, explaining that Frank and Dr Caillier were good friends and that Dr Caillier would find out. (Plaintiff knew that Barber was staying at Dr Caillier's house.)

55. On October 28, 2005 Dr Caillier told her to take the Russo version of the memorial book home over the weekend and make comments on it.

56. On Monday, Dr Caillier asked why she had taken the book home and denied telling her to take it home. She had made written comments in a word document, possibly still existing.

57. On this same day (Halloween), employees were permitted to wear costumes. Plaintiff wore a purple wig, blouse, black skirt, and vest. Dr Caillier was in his office. He asked to see her wig and said shut the door; she pushed it partly closed. He said, "Let me feel your hair" and did so. She explained that it was a wig and he mentioned that she had not taken him out to dinner for being hired. She left

and did not did take him to dinner.

58. On November 10, 2005 she followed up her meeting with Glenda and provided her a letter pertaining to Dr Caillier.

59. On November 21, 2005 she was at the front desk answering the phone for Melissa who was on vacation. Dr Caillier put her evaluation on the desk, and instructed her to look it over and sign it. She objected to him by phone. He came back to the front desk and changed some things to a more positive statement. She signed the evaluation, but told him that she still disagreed with it. She asked for a copy, but he would not give her one which is against policy. She went to talk to him later that day, but he refused to discuss the evaluation with her.

60. The next day she talked to Mr Pope about the evaluation, but he did not think it was all that bad. She complained that Dr Caillier had just put it on her desk and told her to sign it. He directed her to talk to "Jim" (Dr Caillier). She tried, but Dr Caillier refused.

61. She next talked to Glenda about her evaluation who was in some disbelief that Dr Caillier had not had a one-on-one discussion of her evaluation with her, but instead had handed it to her at the front desk.

62. For the Christmas party the week before Christmas, she was to make a one-page item which she made in a folding style. Dr Caillier claimed that she did not follow directions. On December 7, 2005 at 8:45am Dr Caillier told her, "Look, shut up. I don't want to talk to you. When we get back to New Orleans, we're going to talk about your future."

63. Dr Caillier wanted all of the employees to take their materials back to New Orleans in their own cars. On December 15, 2005 he told her, "You're just too much of a hassle. I don't get this from the other two. I'm going to be taking care of a lot more things from now on. We're responsible for our own things. You're going to have to put them in smaller boxes. We'll see where you're going to be working when we get back to New Orleans." He was very angry in tones that approached those used on January 4 below. She talked to Glenda about this.

64. At about this time, Dr Caillier told her, "Glenda is not your boss; you don't work for Glenda, you work for me."

65. On December 16, 2005 he told her that she did "not follow the rules. When we get back to New Orleans, we'll talk about your future with this company." She replied that she "loved her job and was a hard worker." He replied, " Nobody

loves you." He was angry in tones that approached those used on January 4 below.

66. At about the time of the last pay date in 2005, Dr Caillier accused her of discussing people's salaries and bonuses. Instead, information about the company's financial condition had been volunteered to her by Debbi Cocran, Frank Barber's secretary. His tone was violent (the same as that of the parking lot below). He slammed the desk with his hand, and stated that she could be fired for a discussion like this.

67. Shortly before the company left Lafayette, she asked Mrs Bellanca if she had shown the letter to Mrs Taylor. Mrs Bellanca replied that she had not had time because Mrs Taylor was out of town.

### Count 4- Retaliatory harassment post-Katrina in New Orleans

68. On the company's return to New Orleans, she noticed that she was no longer included in Dr Caillier's meetings with the department staff.

69. In New Orleans, it also became harder to take time off for personal matters after the video than before. Grace could come and go as she pleased, but plaintiff was given a hard time about switching a lunch break to arrange a dental appointment.

70. On January 4, 2006 Larry Scott stopped by her office to advise her that she had a flat tire and asked if she wanted to go to the parking lot to look at it. When she returned to the building, she told Dr Caillier about the tire. He instructed her to answer Grace's phone because she was not coming in. She told him that she was calling All State Motor Club to change the tire. Dr Caillier and Elena left the office for a meeting. Soon after they left, Pop-a-Lock called to advise that they were in the parking lot (to change the tire), so she left for the lot. A few minutes later, while she was still in the lot, Dr Caillier and Elena returned to the lot. In a rage, he told her that he had instructed her not to leave the office. (The receptionist was there in her 10-minute absence.) As she did on every occasion when Dr Callier raged at her, she either went to the ladies room or her office to collect herself. This occurred at least once a week or once every other week. Specific examples follow.

71. On January 9, 2006 she received a fax in her name. In an anger that was almost as bad as that in the parking lot, Dr Caillier criticized her for this, saying that he told her not to have anything sent to her name. She replied that she was just trying to do her job. He replied that she did not have a job. Nevertheless, she was busy, e.g., re-designing the company logo to correspond to a change in the company

name, doing an expense report, and making an invitation to a Mardi Gras party. She had little interaction with Dr Caillier. She either went to the ladies room or her office to collect herself.

72. On February 7, 2006, Dr Caillier called her into his office and told that she was going to be put on probation because it seemed as though she "did not get along with Grace or Elena." He instructed her to talk to Glenda Bellanca about the probation. This was the start of her 30-day probation. She either went to the ladies room or her office to collect herself.

Later that day, she met with Glenda Bellanca who also told her that Dr Caillier was sending people to her (Glenda) to make complaints about Ms Troxclair.

73. March came and went with no word on her probation. After the end of 30 days, Dr Caillier still stated to her several times that she was not off of probation and he yelled at her several times. Dr Caillier's angry tone was about ½ the parking lot level. She either went to the ladies room or her office to collect herself.

74. In early to mid April, Dr Caillier accused her of having been rude to an employee in a telephone conversation. Plaintiff wrote a memo denying rudeness. He stated she was "still not off probation." She replied that it had ended months ago, but he replied that it did not matter. Plaintiff was upset and could not understand. She either went to the ladies room or her office to collect herself.

75. Probably shortly before the company moved to another building, plaintiff was assigned to pick up a photograph of Mr Taylor from the Times-Picayune for enlargement. She got directions to the newspaper officer from a security officer, but because of closed streets, could not reach the office, became confused about where she was, and noticed that she was not in a good neighborhood. She called security for assistance, and Mr Lucas offered to come escort her to the newspaper office. Together they picked up the photograph and returned to the Taylor office. The next day Dr Callier berated her for having called security and refused to let her defend herself. Afterwards, she either went to the ladies room or her office to collect herself.

76. In early May 2006 when the company vacated the third floor in New Orleans and moved to another building, Dr Caillier moved to that now vacant floor and she saw him less often, but he still had the same ugly look until her last day of work, June 29.

77. In early May, the new receptionist (Melissa had gone to the new building) made up a phone list that listed employees by their first names. Dr Caillier, in an angry tone that was even with the parking lot tone, questioned whether he had not told

her never to list employees by their first names. He spent at least four hours trying to determine whether Ms Troxclair had anything to do with it. At one point, she heard him exclaim to another employee, "You know how she is!" Finally, he let her "off the hook " temporarily. She either went to the ladies room or her office to collect herself.

### Count 5-Retaliatory discharge

78. During her last week of work, he called her into his office, advised that the other two ladies could not work with her, and that the HR people would talk to her two days later, June 29.

79. On June 27, the HR head, Skip Hebert, arrived. They discussed the work situation in Dr Caillier's department. Plaintiff stated that she loved her work and her belief that she did a good job and asked whether there were some other place in the company where she could work. Herbert suggested a graphics designer position under Glenda in administration; she agreed. She stated that she could work with the two other women, but that Dr Caillier had turned them against her.

80. Within 1-2 days, Dr Caillier stated that she had talked badly about Elena in her conference with Hebert, that this was bad for her, and she should not have done it. He stated that it was Hebert (Company HR) and Ms Taylor's decision that she be terminated.

81. Hebert (Company HR) then came and told her that John Pope (Company President) and Dr Caillier had spoken the night before and decided to terminate her.

### Conclusion

82. Plaintiff contends that the foregoing constitutes pervasive sexual harassment until approximately November 2004, the date of the sexual harassment video, and continuously thereafter severe and pervasive retaliatory harassment until her last day of work. She contends that her termination was in retaliation for her complaints, orally and in writing, about Dr Caillier's sexual harassment. She suffered emotional distress throughout her employment and as a result of her termination

## Relief sought

83. Plaintiff seeks all equitable and legal relief, including damages for lost wages (past and future), emotional distress, punitive damages, attorney's fees, costs, and trial by jury.

Respectfully submitted,

*/s/ Courtney Wilson*
J. Courtney Wilson 13561
1510 Veterans Blvd
Metairie, La 70005
504/832-0585

STATE OF LOUISIANA
PARISH OF JEFFERSON

Sworn and subscribed to before me, Notary, this 22 day of February. 2008.

_____
Patty A. Trufcli

_____
NOTARY